UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

NOT FOR PUBLICATION

| | |
|---|---|
| ROMMEL AMANSEC, *on behalf of himself and those similarly situated*<br><br>Plaintiff,<br><br>v.<br><br>MIDLAND CREDIT MANAGEMENT, INC.,<br><br>Defendant. | Civil Action No.<br>2:15-CV-08798-SDW-SCM<br><br>**REPORT & RECOMMENDATION ON DEFENDANT'S MOTION TO COMPEL INDIVIDUAL ARBITRATION [D.E. 13]** |

**Steven C. Mannion**, United States Magistrate Judge.

I. **INTRODUCTION**

Before this Court is Defendant Midland Credit Management, Inc.'s ("Midland Credit") motion to compel individual arbitration and to dismiss Plaintiff Rommel Amansec's ("Mr. Amansec") individual and class action claims under the Federal Arbitration Act, 9 U.S.C.A. § 1 *et seq.*, or stay the action.[1] The Honorable Susan D. Wigenton, U.S.D.J. referred the pending motion to the undersigned for a report and recommendation.[2] After considering the parties written submissions, the Court decides this matter without oral argument.[3] For the reasons set forth below, it is respectfully recommended that Defendant Midland Credit's motion to compel individualized arbitration and to dismiss or stay the action be **denied**.

---

[1] (Electronic Case Filing Docket Entry ("D.E.") No. 13).

[2] L. Civ. R. 72.1(a)(2).

[3] *See* Fed. R. Civ. P. 78.

II. **BACKGROUND & PROCEDURAL HISTORY**

This case involves alleged violations of the Fair Debt Collection Practices Act resulting from Defendant Midland Credit's attempt to collect a debt from Plaintiff, Mr. Amansec. The relevant facts are as follows: Mr. Amansec applied and received approval for a line of credit to purchase Fingerhut merchandise but allegedly did not receive a credit card or the written terms of his credit agreement.[4] After a Fingerhut credit account ("Fingerhut Account") was opened in Mr. Amansec's name, a welcome packet including the terms of his credit agreement with an arbitration provision ("Original Agreement") was mailed to the New Jersey address he had provided in May 2012.[5] Mr. Amansec certifies that he temporarily moved to Pennsylvania in May 2012 and therefore never received the Original Agreement or any credit card associated with his Fingerhut Account.[6] On June 1, 2012, Mr. Amansec moved to a new address in New Jersey.[7] On June 30, 2012, he completed his first Fingerhut Account purchase via telephone by providing his social security number.[8] At that time, he also provided notice of his updated address yet his Fingerhut merchandise was erroneously shipped to his former New Jersey residence.[9] He never received the merchandise and his account accrued interest on a monthly basis.[10]

---

[4] (D.E. 21-1, Declaration of Rommel Amansec ("Amansec Decl.") ¶ 5).

[5] (D.E. 13-5, Affidavit of Erik Svensen ("Svensen Aff.") ¶¶ 7-8).

[6] (D.E. 21-1, Amansec Decl. ¶¶ 6, 11).

[7] (*Id.* ¶ 6).

[8] (*Id.* ¶ 7; D.E. 13-5, Svensen Aff. ¶ 9).

[9] (D.E. 21-1, Amansec Decl. ¶¶ 7-8).

[10] (*Id.* ¶ 11; D.E. 13-5, Svensen Aff. ¶ 9).

The Original Agreement contained a binding arbitration and class waiver provision.[11] It provided: "[b]y requesting this Account from us and accepting this Agreement, you agree that if a dispute of any kind arises out of this Agreement, either you or we, at our sole discretion, can choose to have the dispute resolved by binding arbitration."[12] "There shall be no authority for any Claims to be arbitrated on a class action basis. An arbitration can only decide your or our Claim and may not consolidate or join the claims of other persons who may have similar claims."[13] The Original Agreement also contained a change of terms provision explicitly stating that the account issuer "MAY CHANGE OR TERMINATE ANY TERM OF THIS AGREEMENT OR ADD NEW TERMS AT ANY TIME."[14]

Mr. Amansec's Fingerhut Account was subsequently sold under multiple account transfer agreements. On July 1, 2012, WebBank, the new credit issuer, updated the terms of the Original Agreement in the WebBank Fingerhut Credit Account Agreement ("Updated Agreement").[15] Like the original, the Updated Agreement contained an arbitration provision and class action waiver.[16] It also included a choice of law provision specifying Utah law would apply to disputes arising out of it.[17] Midland Credit certifies that Mr. Amansec was notified that WebBank would become his

---

[11] (D.E. 13-5, Svensen Aff. at Ex. A, 7).

[12] (*Id.*).

[13] (*Id.*).

[14] (*Id.* at Ex. A, 8).

[15] (*Id.* ¶ 11).

[16] (D.E. 13-2, Certification of Counsel, Lawrence J. Bartel, Esq. ("Bartel Cert.") Ex. B at 5).

[17] (*Id.*).

new credit issuer "before the sale of the [Fingerhut] Account."[18] Mr. Amansec maintains that he also failed to receive the Updated Agreement's written terms.[19]

Midland Funding, LLC ultimately came to own Mr. Amansec's Fingerhut Account.[20] After he failed to make any payments, Midland Funding, LLC "referred the matter to its servicer, [Midland Credit], for collection."[21] Midland Credit subsequently attempted to collect Mr. Amansec's debt which led to the filing of this action.[22] It filed the instant motion arguing the Updated Agreement's explicit class waiver and arbitration provision requires dismissal of Mr. Amansec's claims or alternatively requires the Court to stay the action pending individualized arbitration.[23]

## III. LEGAL STANDARD

Under the Federal Arbitration Act ("FAA" or the "Act"), Congress has "expressed a strong federal policy in favor of resolving disputes through arbitration."[24] Even in light of the FAA's policy, "[a]rbitration is strictly a matter of contract. If a party has not agreed to arbitrate, the courts have no authority to mandate that he do so." [25] Accordingly, "when determining whether there is

---

[18] (D.E. 13-5, Svensen Aff. ¶ 10).

[19] (D.E. 21-1, Amansec Decl. ¶ 11).

[20] (D.E. 13-5, Svensen Aff. ¶¶ 3, 14).

[21] (*Id.* ¶ 12; D.E. 13-1, Def.'s Br. at 12).

[22] (D.E. 1, Compl. ¶¶ 35, 46).

[23] (D.E. 13).

[24] *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 522 (3d Cir. 2009).

[25] *Bel-Ray Co. v. Chemrite Ltd.*, 181 F.3d 435, 444 (3d Cir. 1999) (internal citations omitted); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011).

a valid agreement to submit a dispute to arbitration" the Court considers (1) whether there is a valid agreement to arbitrate between the parties and (2) whether the dispute falls within the scope of that agreement.[26] If "the complaint and its supporting documents are unclear regarding the agreement to arbitrate . . . then the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing on [the] question."[27]

IV. **DISCUSSION**

"A federal court has limited jurisdiction to address a challenge to the validity of an arbitration agreement."[28] In a case where there is a challenge to the "arbitration clause itself – an issue which goes to the making of the agreement to arbitrate – the federal court may proceed to adjudicate it."[29] Under the FAA, this Court is not permitted "to consider claims challenging the contract generally" and must only decide whether a valid agreement to arbitrate exists.[30] Here, Midland Credit is seeking to enforce the Updated Agreement. Mr. Amansec contests the enforceability of the arbitration provision rather than the contract as a whole. He argues that because he never received the Original or Updated Agreements, mutual assent to arbitrate this dispute is lacking. The following analysis is thus limited to the validity of the arbitration provision only and the Court exercises its jurisdiction accordingly.

---

[26] *Certain Underwriters at Lloyd's*, 584 F.3d at 525.

[27] *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013).

[28] *Hall v. AT&T Mobility LLC,* 608 F. Supp. 2d 592, 596 (D.N.J. 2009).

[29] *Id*. (internal citations omitted).

[30] *Id.*

### A. Choice of Law

To determine whether the parties agreed to arbitrate, the Court applies "ordinary state-law principles that govern the formation of contracts."[31] Here, the Court must first determine which state's law applies. Midland Credit appears to contend that the Updated Agreement's choice of law provision designating Utah law governs while Mr. Amansec ignores the choice of law provision altogether and assumes New Jersey law applies.[32] The Updated Agreement is unhelpful regarding this issue because in choosing Utah law to enforce arbitration it does not extend to Utah's choice of law provisions.[33] Since "[t]he federal policy encouraging recourse to arbitration requires federal courts to look first to the relevant state law of contracts . . . in deciding whether an arbitration agreement is valid under the FAA" the Court will first look to New Jersey choice of law rules in determining whether the Utah choice of law clause is enforceable.[34] This is proper because the allegations arise out of New Jersey contacts and New Jersey law would apply if the Court's jurisdiction was based on diversity of citizenship.[35]

---

[31] *Kirleis v. Dickie, McCamey & Chilcote*, 560 F.3d 156, 160 (3d Cir. 2009) (internal citations omitted).

[32] (*See generally* D.E. 13-1, Def.'s Br.; D.E. 21, Pl.'s Br.).

[33] (D.E. 13-5, Svensen Aff. Ex. B at 11).

[34] *Gay v. CreditInform*, 511 F.3d 369, 389 (3d Cir. 2007) (internal citations omitted).

[35] *Id.* (explaining "it seems reasonable to use Pennsylvania law in evaluating the choice-of-law provision. The use of Pennsylvania law on this choice-of-law question is consistent with what we said in *Spinetti* that the federal policy encouraging recourse to arbitration requires federal courts to look first to the relevant state law of contracts . . . in deciding whether an arbitration agreement is valid under the FAA. Furthermore, if the District Court's jurisdiction in this federal question case had been based on diversity of citizenship of the parties we would apply Pennsylvania's choice-of-law principles as the court was in the Eastern District of Pennsylvania") (internal citations omitted).

When contracting parties agree to be governed by a certain state's laws, "New Jersey courts will uphold the contractual choice if it does not violate New Jersey's public policy." [36] To determine whether a contractual choice of law should be enforced, New Jersey courts follow the Restatement (Second) of Conflicts of Laws § 187(2) ("Restatement"), which provides that New Jersey law will govern if:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, *or*
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which would be the state of the applicable law in the absence of an effective choice of law by the parties. [37]

Applying this test, the Court will enforce Utah law as contemplated by the Updated Agreement. First, the "substantial relationship" standard is satisfied with respect to the parties and the transactions in this case. WebBank, which became the new credit issuer under the Updated Agreement, is organized under the laws of Utah and reasonably chose the laws of the state in which it conducts business.[38] While no longer a party, WebBank assigned its rights under the Updated Agreement and Midland Funding became the current owner and servicer of Mr. Amansec's Fingerhut Account debt.[39] Midland Funding and Midland Credit, as its agent and affiliate, bear a

---

[36] *N. Bergen Rex. Transp., Inc. v. Trailer Leasing Co.*, 158 N.J. 561, 568-69 (1999).

[37] *Id.* (emphasis added).

[38] While Midland Credit fails to identify a relationship with Utah, the Court takes judicial notice of WebBank's website which indicates Utah as its headquarters and state of incorporation, http://www.webbank.com/. *See N. Bergen Rex. Transp.*, 158 N.J. at 569; *see also* Restatement (Second) Conflict of Laws § 187(2), cmt. f. (Am. Law Inst. 1988).

[39] (D.E. 13-6, Affidavit of Michael Burger ("Burger Aff.") ¶ 5, Ex. C).

sufficient nexus to WebBank as assignees and a reasonable basis to enforce Utah law exists.[40] Second, applying Utah law would not run "contrary to a fundamental policy" of New Jersey. Both states share a general policy favoring arbitration[41] and interpret contracts using similar rules.[42] To determine the validity of the arbitration provision, the Court will thus apply Utah law governing the formation of contracts.[43]

### B. Agreement to Arbitrate Under Utah Law

In this case, Mr. Amansec argues that he could not have agreed to arbitrate because he did not receive any written terms with regard to the Original or Updated Agreements. Midland Credit maintains that the Original Agreement's written terms were mailed to Mr. Amansec at his provided New Jersey address and when he subsequently used his Fingerhut Account to make a purchase he mutually assented to the arbitration provision.[44] Midland Credit also certifies that notice was provided to Mr. Amansec prior to the Updated Agreement taking effect.[45] For the reasons that

---

[40] The Court also takes judicial notice of Midland Credit's website which identifies it as an affiliate of Midland Funding, https://www.midlandcreditonline.com/who-is-mcm/, and federal court decisions that indicate the same. *See Harris v. Midland Credit Mgmt., et al.,* Civ. No. 15-4453(SDW)(SCM) (D.N.J. Feb. 8, 2016) Document No. 28; *see also Madden v. Midland Funding, LLC*, 786 F.3d 246, 248 (2d Cir. 2015).

[41] *See Cohen v. Chase Bank, N.A.*, 679 F. Supp. 2d 582, 592 (D.N.J. 2010) (internal citations omitted); *Roberts v. Cent. Refrigerated Serv.*, 27 F. Supp. 3d 1256, 1259 (D. Utah 2014) (internal citations omitted).

[42] *See Atalese v. U.S. Legal Services Grp.*, 219 N.J. 430, 313-14 (2014); *McCoy v. Blue Cross & Blue Shield of Utah*, 20 P.3d 901, 905 (Utah 2001).

[43] *See Hall*, 608 F. Supp. 2d at 596.

[44] (D.E. 13-5, Svensen Aff. ¶ 8).

[45] (*Id.* ¶ 10).

8

follow, the Court cannot yet conclude that Mr. Amansec agreed to arbitration since it is unclear whether the written terms under either agreement were provided to him.

      i. Mutual Assent

Citing New Jersey law, Midland Credit argues that mutual assent "is not dependent on whether and how [Mr. Amansec] received" the terms and conditions since use of his credit card alone signifies assent to the arbitration provision.[46] Since the parties' choice of law provision is being honored, the Court will consider this argument in the context of applicable Utah law. Under Utah law, a binding contract requires a meeting of the minds between competent parties and consideration.[47] "Contractual mutual assent requires assent by all parties to the same thing in the same sense so that their minds meet as to all the terms."[48] By statute, Utah law also provides that unsigned credit agreements are valid and enforceable if: "(i) the debtor is provided with a written copy of the terms of the agreement; (ii) the agreement provides that any use of the credit offered shall constitute acceptance of those terms; and (iii) after the debtor receives the agreement, the debtor, or a person authorized by the debtor, requests funds pursuant to the credit agreement or otherwise uses the credit offered."[49]

---

[46] (D.E. 26, Def.'s Reply at 6). *See Novack v. Cities Service Oil Co.*, 149 N.J. Super. 542, 549 (1977); *see also Dimick v. First USA Bank, N.A.*, No. 99-2550, 2000 U.S. Dist. LEXIS 20910, at *5 (D.N.J. Jan. 14, 2000); *see also MBNA Am. Bank, N.A. v. Bibb*, No. A-4087-07T2, 2009 N.J. Super. Unpub. LEXIS 1650, at *7 (N.J. Super May 6, 2009) (internal citations omitted).

[47] *See John Deere Co. v. A & H Equip.*, 876 P.2d 880, 884 (Utah Ct. App. 1994) (internal citations omitted); *Uhrhahn Constr. & Design, Inc. v. Hopkins*, 179 P.3d 808, 813 (Utah 2008) (internal citations omitted).

[48] *John Deere*, 876 P.2d at 884 (internal citations omitted).

[49] UTAH CODE ANN. § 25-5-4 (LexisNexis 2016).

As an initial matter, the Court need not address the parties' dispute over whether the Updated Agreement constituted an invalid, unilateral "bill stuffer" amendment.[50] Even if the Updated Agreement added a new and binding arbitration requirement, change of terms provisions and amendments in credit agreements, including the *addition* or *modification* of arbitration provisions, are valid and enforceable under Utah law.[51] Here, the parties' dispute centers on whether written terms, if any, were provided to Mr. Amansec. With regard to the Updated Agreement, Midland Credit argues its terms were delivered by mail.[52] However, the corresponding affidavit merely states that Mr. Amansec was notified "before the sale of the [Fingerhut] Account" that WebBank would become his new credit issuer.[53] While Midland Credit characterizes Mr. Amansec's affidavit as "self-serving," the Court cannot glean when or even how any notice was delivered to him based on these assertions.

It is equally unclear whether the welcome packet including the Original Agreement's terms were provided to Mr. Amansec. Contrary to Midland Credit's position, unsigned credit agreements are only valid and enforceable under Utah Law if, among other requirements, the debtor is "provided with a written copy of the terms of the agreement."[54] In other words, if Mr. Amansec did not initially receive the Original Agreement's written terms then he remained unaware of the arbitration provision and "assent by all parties to the same thing in the same sense so that their

---

[50] (*See* D.E. 21, Pl.'s Br. at 16-18; D.E.26 Def.'s Reply at 15-16).

[51] UTAH CODE ANN. § 70C-4-102 (LexisNexis 2016) (emphasis added).

[52] (D.E. 13-1, Def.'s Br. at 7-8).

[53] (D.E. 13-5, Svensen Aff. ¶ 10).

[54] UTAH CODE ANN. § 70C-4-102.

minds meet as to all the terms" would be impossible.[55] Since both parties ambiguously highlight May 2012 as the critical time period, the Court finds it possible that Mr. Amansec relocated to Pennsylvania prior to the welcome packet's arrival at his initial New Jersey residence. Such a scenario is buttressed by Mr. Amansec's apparent need to provide his social security number (rather than a credit card or account number) to identify his Fingerhut Account and complete the June 30, 2012 purchase.[56] On the other hand, the facts are subject to the opposite interpretation. For example, Mr. Amansec's sole mention of providing a new mailing address also occurred on June 30, 2012. However, Midland Credit's records confirm that a Fingerhut Account statement was addressed and mailed to him at a Pennsylvania address.[57] It is thus conceivable that he received the Original Agreement in May 2012 and provided an updated address pursuant to its terms.

For these countervailing reasons, the Court cannot yet conclude that Mr. Amansec mutually assented to arbitrate. While a presumption in favor of arbitration exists, it "disappears when the parties dispute the existence of a valid arbitration agreement."[58] Here, a genuine dispute as to whether Mr. Amansec received any written terms persists. In a case such as this, where "the complaint and its supporting documents are unclear regarding the agreement to arbitrate . . . then

---

[55] *John Deere*, 876 P.2d at 884 (internal citations omitted).

[56] (D.E. 21-1, Amansec Decl. ¶ 7).

[57] (D.E. 13-6, Burger Aff. at Ex. B). The account statement bearing Mr. Amansec's Pennsylvania address appears to be dated on or about January 2013, long after his relocation back to New Jersey, and further confuses the factual record. Since the Affidavit of Erik Svensen, submitted by Midland Credit, certifies that "a notation is made . . . in the account holder's account record reflecting the correspondence received," limited discovery may demonstrate when Mr. Amansec provided notice of his Pennsylvania mailing address. (D.E. 13-5, Svensen Aff. ¶ 10).

[58] *Strong v. Geringer*, No. 2:15-CV-00837-TC, 2016 U.S. Dist. LEXIS 125936, at *8 (D. Utah Sep. 15, 2016).

the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing on [the] question." [59] In light of the incomplete factual record, the parties must resolve the question of whether Mr. Amansec received the Original or Updated Agreement's written terms with the aid of limited discovery before the Court addresses the remaining questions of arbitrability.

## V. CONCLUSION

For the reasons discussed herein, it is respectfully recommended that Defendant Midland Credit's motion to compel individualized arbitration and to dismiss or stay the action be **denied without prejudice**. The parties have fourteen days to file and serve any objections to this Report and Recommendation.[60] "The District Court need not consider frivolous, conclusive, or general objections."[61]



Honorable Steve Mannion, U.S.M.J.
United States District Court,
for the District of New Jersey
phone: 973-645-3827

1/20/2017 12:13:12 PM

Original: Clerk of the Courtd
Hon. Susan D. Wigenton, U.S.D.J.
cc: All parties
   File

---

[59] *Guidotti*, 716 F.3d at 776.

[60] 28 U.S.C. § 636; L. Civ. R. 72.1(c)(2).

[61] *See Battles v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir.1987).