**Not for Publication**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROMMEL AMANSAC, on behalf of himself and those similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>MIDLAND CREDIT MANAGEMENT, INC.,<br><br>*Defendants*. | Civil Action No. 15-8798<br><br>**OPINION** |

**Evelyn Padin, U.S.D.J.**

Before this Court is Plaintiff Rommel Amansac's motion for class certification, brought pursuant to Federal Rule of Civil Procedure 23. D.E.s 186, 187. Defendant Midland Credit Management ("MCM") opposes the motion. D.E.s 190, 191. The Court has reviewed all submissions in support and in opposition, and considered the motion without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the following reasons, Amansac's motion is denied.

**I.   BACKGROUND**

MCM collects on debt purchased and owned by its affiliate, Midland Funding, LLC ("MF").[1] Amansac is a consumer who incurred debt after purchasing a bed platform from

---

[1] Amansac claims that only MF, and not MCM, can enforce the arbitration provisions identified *infra* because MCM "is not a party or an assignee to [accounts purchased by] MF that may have included arbitration agreements" and "[a]ny alleged arbitration agreements, if they exist, can only be raised by MF." D.E. 177 at 2. The Court disagrees. Indeed, this assertion ignores both MCM and MF's clear, close, and well-established agent-affiliate relationship, *see*, *e.g.*, *Harris v. Midland Credit Management, Inc.*, Civil Action No. 15-4453 (SDW)(SCM), 2016 WL 475349, at *2 n.4 (Feb. 28, 2016) (collecting cases), and the broadly-worded assignment provisions within the arbitration agreements at issue. *See Lance v. Midland Credit Management Inc.*, Civil Action No.

Fingerhut on credit in 2012. On or about February 26, 2013, MF acquired "all . . . right, title and interest" in that debt. D.E. 190-2 ¶ 15; D.E. 190-3 at Ex. C. Thereafter, on or about December 22, 2014, MCM sent a collection notice to Amansac requesting payment in the amount of $651.42 for his Fingerhut debt. *See* D.E. 1-1. Per the collection notice, $140.60 of that $651.42 sum represented accrued interest. *Id.* Amansac avers that "MCM has no statutory or contractual right to assess any interest or additional amounts" on the debt. D.E. 1 at ¶ 32. And on December 21, 2015, he initiated this putative class action challenging MCM's debt collection practices under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.* D.E. 1.

Amansac now moves for class certification under Rule 23. In so doing, he seeks to represent a putative class of "1,741 New Jersey consumers [to whom MCM sent a collection letter] to collect [on] WebBank/Fingerhut accounts."[2] D.E. 189-1 at 1. The following additional facts bear on Amansac's motion to certify this putative class:

### a. Amansac Opens His Fingerhut/MetaBank Account

On May 6, 2012, Amansac applied for, and was approved for, a Fingerhut-branded credit account (the "Fingerhut Account"); that account was originated by MetaBank. D.E. 190-2 ¶¶ 3, 7. After Amansac's Fingerhut credit application was approved, a welcome packet was mailed to him at his New Jersey address; the packet contained a copy of the MetaBank Fingerhut Credit

---

18-4933, 2019 WL 2143362, at *1 ("[MCM,] the debt collector[,] may compel individual arbitration of this dispute within the scope of the arbitration clause" because "the bank's right to arbitrate is within 'all' of its right[s] sold [by the bank to MF]").

[2] This class is more specifically defined as: "All consumers in the State of New Jersey, from whom, beginning December 21, 2014, through and including March 20, 2020, [MCM] attempted to collect a charged-off consumer debt allegedly owed to [MF], (a) by sending a collection letter stating balances higher than the charged-off balance because interest was added by [MCM] to the charged-off balance, and (b) was seeking to collect a consumer debt alleged to be originally owed to WebBank/Fingerhut Credit." D.E. 189-1 at 1.

Account Agreement ("MetaBank Agreement"). D.E. 190-2 ¶ 8. That agreement contains the following arbitration provision:

> By requesting an Account from us and accepting this Agreement, you agree that if a dispute of any kind arises out of this Agreement, either you or we, at our sole discretion, can choose to have that dispute resolved by binding arbitration. If arbitration is chosen by any party, neither you nor we will have the right to litigate that claim in court or to have a jury trial on that claim, or to engage in pre-arbitration discovery, except as provided for in the arbitration rules. In addition, you will not have the right to participate as a representative or member of any class of claimants pertaining to any claim subject to arbitration.

D.E. 190-2 at Ex. A.

The MetaBank Agreement further indicates that "[y]ou and MetaBank will be bound by this Agreement from the first time you use your account." *Id.* It also states that the account issuer, MetaBank, "MAY CHANGE OR TERMINATE ANY TERM OF THIS AGREEMENT OR ADD NEW TERMS AT ANY TIME." *Id.*

MetaBank transferred its rights in, *inter alia*, Amansac's Fingerhut Account to WebBank via an account transfer agreement dated June 28, 2012. D.E. 190-2 ¶¶ 3, 7. As of July 1, 2012, WebBank became Amansac's new credit issuer for the Fingerhut Account. *Id.* at ¶ 10. The parties' account agreement was likewise updated. *Id.* at ¶ 11.

### b. The WebBank Agreement

The WebBank Fingerhut Credit Account Agreement ("WebBank Agreement"), which as of July 1, 2012, supplanted the prior MetaBank Agreement, contains the following arbitration provision:

> Arbitration. Please review this provision carefully. It provides that any dispute may be resolved through binding arbitration. Arbitration replaces the right to go to court and the right to have a jury decide the dispute. Under this provision, your rights may be substantially limited in the event of a dispute. You may opt out of

this Arbitration provision by following the instructions below.

By accepting this Agreement, unless you opt out by following the instructions below, you agree that either you or we, at our sole discretion, can choose to have any dispute arising out of or relating to this Agreement or our relationship resolved by binding arbitration. If arbitration is chosen by any party, neither you nor we will have the right to litigate that dispute in court or to have a jury trial on that dispute. Pre-arbitration discovery will be permitted only as allowed by the arbitration rules. In addition, you will not have the right to participate as a representative or member of any class of claimants pertaining to any dispute subject to arbitration. . . .

For purposes of this Arbitration provision, "dispute" shall be construed as broadly as possible, and shall include any claim, dispute or controversy (whether in contract, regulatory, tort or otherwise, whether pre-existing, present or future and including constitutional, statutory, common law, international tort and equitable claims) arising from or relating to this Agreement, the credit offered or provided to you or the goods or services you purchase; the actions of yourself, us or third parties; or the validity of this Agreement or this Arbitration provision. It includes disputes brought as counterclaims, cross claims, or third party claims. A party that has brought a dispute in court may elect to arbitrate any other dispute that may be raised in that litigation. Disputes brought as part of a class action or other representative basis are subject to arbitration on an individual (non-class, non-representative) basis. IF YOU DO NOT OPT OUT, THEN YOU WILL HAVE WAIVED YOUR RIGHT TO INDICATE OR PARTICIPATE IN A CLASS ACTION RELATED TO THIS AGREEMENT. In this Arbitration provision, the words "we," "us," and "our" shall include WebBank and any assignees of any WebBank's rights, any merchant from which you purchased goods or services using your Account, as well as their respective affiliates, servicers, employee, agents, and future assigns.

. . . .

This arbitration provision shall survive repayment of your extension of credit and termination of your Account.

D.E. 190-2 at Ex. B.

The WebBank Agreement further expressly indicates that "[y]ou and WebBank will be bound by this Agreement from the first time a transaction is posted to your account." *Id.*

4

Critically, the parties agree that the specific WebBank Agreement provisions cited above are applicable to the Fingerhut credit accounts of *all* members of the putative class Amansac seeks to represent. *See* D.E. 189-1 at Ex. A (MCM providing copies of "the two unique WebBank cardholder agreements that govern[] the accounts of [Amansac] and [the] putative class."); D.E. 186-1 at 2 (Amansac averring that "[a]ll the 1,741 accounts at issue were subject to one or the other of only two WebBank Fingerhut account agreements.").

### c. MF's Acquisition of Amansac's Fingerhut Debt

Amansac made his one and only purchase using the Fingerhut Account on or about June 30, 2012. D.E. 190-2 ¶ 9; D.E. 21 at 3. Amansac never made a payment towards the Fingerhut Account, and his account was charged off on February 7, 2013 due to nonpayment. D.E. 190-2 ¶ 13. On or about February 19, 2013, WebBank sold, assigned, and conveyed accounts, including Amansac's Fingerhut Account, to Bluestem Brands, Inc. ("Bluestem").[3] *Id.* at ¶ 14. On or about February 26, 2013, Bluestem sold "all of [its] right, title and interest" in certain charged off accounts, including Amansac's Fingerhut Account, to MF. D.E. 190-2 ¶ 15; D.E. 190-3 at Ex. C. MF is the current owner of Amansac's Fingerhut Account, D.E. 190-3 at ¶ 2 & Ex. C. MCM, an MF affiliate, is the debt servicer of this account. D.E. 190-3 at ¶ 1.

On or about December 22, 2014, MCM sent a collection notice to Amansac requesting payment in the amount of $651.42, inclusive of $140.60 in accrued interest. *See* D.E. 1-1. As noted, Amansac avers that "MCM has no statutory or contractual right to assess any interest or additional amounts" on the debt owed by Amansac. D.E. 1 at ¶ 32. And on December 21, 2015, he initiated this putative class action challenging MCM's debt collection practice. D.E. 1.

---

[3] Bluestem also acted as the loan servicer and custodian of records for Amansac's Fingerhut Account during both MetaBank and WebBank's ownership of the account. D.E. 190-2 ¶ 4.

### d. Amansac's Successful Efforts to Resist Arbitration

Notably, Amansac, since initiating this matter, has successfully resisted all attempts by MCM to compel arbitration under the terms of the WebBank Agreement. On August 15, 2016, MCM moved for the first time to compel Plaintiff to adjudicate his claims in arbitration. D.E. 13. MCM, by way of that motion, asserted that the language in the WebBank Agreement, including the arbitration provisions detailed above, controlled, and that both MF, the present owner of the Amansac's Fingerhut Account, and MCM, MF's agent and affiliate who is the servicer of the debt, were entitled to enforce those provisions. D.E. 13 at 3-4, 10-11. Amansac opposed. D.E. 21. His primary argument in opposition was that due to frequent moves in 2012, he never received the original MetaBank Agreement or the updated WebBank Agreement, both of which were sent to him via U.S. mail, and thus, Amansac could not have consented to the terms in those agreements. *See* D.E. 21-1.

On January 20, 2017, Judge Mannion issued a Report & Recommendation recommending that MCM's motion to compel arbitration be denied without prejudice because the Court could not "yet conclude that Mr. Amansac agreed to arbitration since it is unclear whether the written terms under either [the original MetaBank Agreement or the updated WebBank Agreement] were provided to him." D.E. 30 at 9, 12. On February 10, 2017, Judge Wigenton entered an Order adopting Judge Mannion's Report & Recommendation. D.E. 31.

On February 21, 2019, after additional discovery, MCM filed its second motion to compel arbitration. D.E. 84. Amansac again opposed, again averring, *inter alia*, that, based on frequent moves during the relevant period in 2012, he never received either of the account agreements that were both sent to him via U.S. mail. D.E. 89, 90; *accord* D.E. 110 at 8. On July 18, 2019, Judge Mannion issued a Report & Recommendation recommending that MCM's second motion to

6

compel arbitration be denied "based on the [still] unresolved issue of whether Mr. Amansac received either [the original MetaBank or updated WebBank] Agreements [in the mail]." D.E. 110 at 13.  On August 15, 2019, Judge Wigenton entered an Order adopting Judge Mannion's second Report & Recommendation issued in this matter.  D.E. 117.

Importantly, Judge Mannion correctly recognized that: (1) "[t]he Federal Arbitration Act[, ("FAA"), 9 U.S.C. § 2,] provides that a written contract provision pertaining to a commercial transaction 'shall be valid, irrevocable, and enforceable;'" (2) "[a]ny doubts concerning the scope of arbitrability should be resolved in favor of arbitration, in light of the 'liberal federal policy favoring arbitration agreements;'" (3) "'[a] federal court has limited jurisdiction to address a challenge to the validity of an arbitration agreement;'" and (4) "'[u]nder the FAA, this Court is not permitted "to consider claims challenging the contract generally' and must only decide whether a valid agreement to arbitrate exists."  D.E. 110 at 6-8 (citations omitted).

Judge Mannion's decisions accordingly emphasized that it was the highly unique factual circumstances of Amansac's situation which supported his findings of non-arbitrability.  *See* D.E. 110 at 11-13.  Indeed, His Honor recommended that MCM's motions to compel arbitration be denied because MCM failed to satisfactorily demonstrate that Amansac ever received copies of the agreements compelling arbitration; his decisions, in other words, were not grounded in the validity of the language within those agreements.

  e. **The Present Class Certification Motion**

The parties thereafter engaged in further discovery, and Amansac now moves for class certification of Rule 23(b)(3) class.  Amansac seeks to represent a class of 1,741 New Jersey consumers to whom MCM sent a collection letter in which it improperly added interest on debt "originally owed to WebBank/Fingerhut Credit."  D.E. 189-1 at 1.  Critically, Amansac, in so

7

moving, expressly notes that "[a]ll the 1,741 accounts at issue were subject to one or the other of only two WebBank Fingerhut account agreements," *see* D.E. 186-1 at 2, which, as noted *supra*, both contain the broadly-worded arbitration and class action waiver provisions cited above.

## II. LEGAL STANDARD

A "party proposing class-action certification bears the burden of affirmatively demonstrating by a preponderance of the evidence [its] compliance with the requirements of Rule 23." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015), *as amended* (Apr. 28, 2015) (citing *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013)). Specifically, "every putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012).

Under Rule 23(a), a class may be certified only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(1)-(4). These requirements are, respectively, referred to as numerosity, commonality, typicality, and adequacy. *See*, *e.g.*, *Marcus*, 687 F.3d at 590-91.

A party, like Amansac, who seeks class-certification under Rule 23(b)(3) must satisfy several additional requirements. First, Rule 23(b)(3) requires the party seeking certification to show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Second, "[a] plaintiff seeking certification of a Rule 23(b)(3) class must prove by a preponderance of the evidence that the class is ascertainable." *Byrd*, 784 F.3d at 163. To do so, the plaintiff must show

8

that "(1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Id.* (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)). These additional requirements are, respectively, referred to as predominance, superiority, and ascertainability. *See, e.g., Byrd*, 784 F.3d at 161 n.4, 162, 164.

## III. ANALYSIS

### a. Typicality

Under Rule 23(a)(3)'s typicality requirement, a party seeking class certification must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." The purpose of this requirement is to "screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class." *Marcus*, 687 F.3d at 598 (citation omitted). To determine whether a plaintiff has satisfied the typicality requirement this Court must "consider the attributes of the plaintiff, the class as a whole, and the similarity between the plaintiff and the class." *Id.* (citing *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d at 597). This comparative analysis addresses:

> three distinct, though related, concerns: (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class.

*Id.* (quoting *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d at 599).

Critically, "[i]t is well established that a proposed class representative is not 'typical' under Rule 23(a)(3) if 'the representative is subject to a unique defense that is likely to become a major

9

focus of the litigation.'" *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d at 598 (citation omitted).

MCM argues that Amansac cannot satisfy Rule 23(a)(3)'s typicality requirement because he, unlike virtually every other putative class member, is not bound to the arbitration and class action waiver provisions contained within the "WebBank Fingerhut account agreements" that Amansac himself claims "[a]ll [other of] the 1,741 accounts at issue [are] subject to." Amansac's Br. in Supp. of Class Cert., D.E. 186-1 at 2; *see also* MCM's Br. in Opp. to Class Cert., D.E. 189 at 23-24. MCM, in other words, asserts that Amansac's "claims and valid defenses in this matter are uncommon and atypical because he is . . . not subject to the WebBank/Fingerhut arbitration and class waiver provisions contained in the relevant cardholder agreements." D.E. 189 at 24. The Court agrees.

Here, Amansac has vigorously and successfully opposed all of MCM's previous attempts to compel arbitration based on his assertion that due to frequent relocations in 2012, he never received a copy of the WebBank Agreement that was sent to him – and presumably to all other members of the putative class – via regular U.S. mail. Due to Amansac's highly unique situation, he is not subject to the broadly-worded arbitration provision that it wholly appears all other – or nearly all other – putative class members would be subject to. That the relevant arbitration provision would likely be valid and applicable to virtually every other class member is sufficient to preclude Amansac, who has successfully resisted efforts to compel arbitration based on his unique circumstances, from representing a class largely made up of individuals that may be subject to the agreement.[4]

---

[4] The Court wishes to make clear that "[a]t class certification, the question for this Court to decide is not the validity of the agreement but whether the presence of class members that are potentially subject to the provision satisfies the requirements of Rule 23. This Court will not compel absent

This consideration, in other words, precludes Amansac from satisfying Rule 23(a)(3)'s typicality requirement. *See Abdul-Baaqiy v. Fed. Nat'l Mortg. Ass'n*, 149 F. Supp. 3d 1, 11 (D.D.C. 2015) ("[Plaintiff's] claims are atypical of the alleged class because he is the only member who has exhausted his obligation to arbitrate. All other members of the possible class are subject to mandatory arbitration before they are free to sue in court. Because Plaintiff has failed to meet the typicality requirement, his class action claims will be stricken from the amended complaint."); *Jensen v. Cablevision Systems Corporation*, 372 F.Supp.3d 95, 122-24 (E.D.N.Y. 2019) (denying class certification for lack of typicality since "over 99 percent of the proposed class" was subject to a potentially valid arbitration provision that the named plaintiff opted out of, and thus, were "potentially subject to possible [arbitration and class-action waiver] defenses that are inapplicable to [the putative class representative]."); *Spotswood v. Hertz Corp.*, No. CV RDB-16-1200, 2019 WL 498822, at *11 (D. Md. Feb. 7, 2019) ("[Plaintiff] cannot meet the typicality requirement because he did not sign an arbitration agreement while other putative class members did."); *Tan v. Grubhub, Inc.*, No. 15-cv-05128, 2016 WL 4721439, at *3 (N.D. Cal. July 19, 2016) (named plaintiff could not satisfy typicality requirement because he was "in a position unique from all but one other" potential class member as she he had opted out of the arbitration agreement); *Quinlan v. Macy's Corporate Servs.*, Civ. No. 12–00737DDP, 2013 WL 11091572, at *3 (C.D. Cal. Aug. 22, 2013) (denying class certification motion as plaintiff was atypical of the class because he was a union member and not required to arbitrate, while class members were non-union and subject to mandatory arbitration); *Renton v. Kaiser Found. Health Plan, Inc.*, Civ. No. C00-5370RJB, 2001

---

putative class members who are not before this Court to binding arbitration or issue a ruling regarding the enforceability of the provision." *Jensen v. Cablevision Systems Corporation*, 372 F.Supp.3d 95, 123 (E.D.N.Y. 2019) (citing *Whittington v. Taco Bell of America, Inc.*, No. 10-CV-01884, 2011 WL 1772401, at *7 (D. Colo. May 10, 2011)).

WL 1218773, at *7 (W.D. Wash. Sept. 24, 2001) (named plaintiff was atypical because she was not compelled to arbitrate like proposed class members were); *see also Forby v. One Technologies, LP*, Civil Action No. 3:16-CV-856-L, 2020 WL 4201604, at *10 (N.D. Tx. July 22, 2020) ("the court determines that the putative class members are likely bound by the arbitration clause at issue, unlike Ms. Forby, which precludes her ability to certify a class under Federal Rule of Civil Procedure Rule 23.").

### b. Adequacy

Rule 23(a)(4) requires a showing that named plaintiffs will fairly and adequately protect the interests of the class, because they "have the ability and incentive to vigorously represent the claims of the class." *Rivet v. Off. Depot, Inc.*, 207 F. Supp. 3d 417, 430 (D.N.J. 2016) (citing *In re Cmty. Bank of N. Virginia Mortgage Lending Practices Litig.*, 795 F.3d 380, 393 (3d Cir. 2015)). "[T]he linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Id.* "Class representatives must be part of the class and possess the same interest and suffer the same injury as the class members." *Beneli v. BCA Fin. Servs., Inc.*, 324 F.R.D. 89, 98 (D.N.J. 2018) (citation omitted). Determining adequacy involves a two-part inquiry: (1) "the named plaintiff's interests must be sufficiently aligned with the interests of the absentees;" and (2) "the plaintiff's counsel must be qualified to represent the class." *Id.* A named plaintiff is adequate if their interests do not conflict with those of the class members. *Id.*

Here, the Court finds, for substantially the same reasons and considerations detailed in the Typicality section of this opinion, that Amansac cannot satisfy Rule 23(a)(4)'s adequacy requirements. *See Jensen*, 372 F.Supp.3d at 124 ("In the instant case, the Defendants' argument that opting out of the arbitration provision subjected the absent class to unique defenses

encompasses both typicality and adequacy."); *Forby*, 2020 WL 4201604, at *10 ("unlike Ms. Forby, the putative class members would be bound by the terms of the arbitration agreement . . . [and thus cannot satisfy] the typicality and adequate representative requirements.").

    c. **Amansac's Arguments Regarding Arbitration Are Unpersuasive**

Amansac, in his reply, avers that "MCM's claims that arbitration affects the class are unsupported and in error." D.E. 192 at 7. Amansac, relying on distinguishable case law, then goes on to list a litany of disjointed arguments in support of this claim. The Court will briefly explain why Amansac's arguments fail.

Amansac's principal assertion against the enforceability of the arbitration provision is that "MCM does not submit any supporting evidence (besides their say-so) that any of the class members are subject to arbitration." D.E. 192 at 8. This self-serving argument disregards the fact that MCM has provided copies of the relevant credit account agreements which Amansac himself claims are applicable to all members of the putative class, and likewise ignores that those agreements unequivocally state that the arbitration provisions "include WebBank and any assignees of any WebBank's rights [and] their respective affiliates, servicers, employee, agents, and future assigns." Moreover, the evidence before the Court shows that MF purchased "all of [the] right, title and interest" to the putative class members' Fingerhut Accounts, inclusive of the right to arbitrate.

Amansac also conveniently fails to make any reference to his years' long, ultimately successful, efforts to resist arbitration through significant motion practice in this Court, and the resulting, well-thought out decisions by Judge Mannion which make clear that the non-applicability of this mandatory arbitration provision to Amansac is indeed based on his unique circumstances. In short, there is significant supporting evidence in the record which suggests that

substantially all of the other putative class members may be subject to the arbitration provision set forth in the relevant credit account agreements.

Furthermore, while it is undisputed that MF was not a party to the original credit account agreements, the cases Amansac cites for the proposition that the enforceability of the arbitration provision does not extend to MF as a non-party to the original agreements are entirely distinguishable, and ultimately unpersuasive. *See White v. Sunoco, Inc.*, 870 F.3d 257, 267-68 (3d Cir. 2017) (affirming district court's denial of motion to compel arbitration where the relevant arbitration agreement failed to "provide for a third party . . . the ability to elect arbitration or to move to compel arbitration."); *Saroza v. Client Services, Inc.*, No. 17-3429, 2020 WL 948793, at *2-3 (D.N.J. Feb. 27, 2020) (denying third-party's motion to compel arbitration where "You" and "we" were narrowly defined by the arbitration agreement at issue to include only the person who opened the account and the original credit issuer) (citing *White*, 870 F.3d at 267-68.); *Rodriguez-Ocasio v. Midland Credit Management, Inc.*, No. 17-3630-ES-MAH, 2021 WL, at *4 (D.N.J. Aug. 25, 2021) (denying plaintiff's motion to compel arbitration where "[t]he plain meaning of the Purchase Agreements indicates that [plaintiff] did not purchase and was not assigned the right to compel arbitration.").

### d. No Additional Rule 23 Analysis is Required

As noted, "every putative class action *must* satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)." *Marcus*, 687 F.3d at 590 (emphasis added). As the foregoing makes clear, Amansac has not – and cannot – satisfy Rule 23(a)(3)'s typicality requirement, nor can he satisfy Rule 23(a)(4)'s adequacy requirement. Amansac's failure to satisfy these two requirements is dispositive of the present motion. The Court therefore declines to engage in further analysis under Rules 23(a)(1), 23(a)(2), and 23(b)(3). *In re Actiq Sales & Mktg. Pracs.*

14

*Litig.*, 307 F.R.D. 150, 173 (E.D. Pa. 2015) ("Plaintiffs' failure to satisfy the criteria of Rule 23(b)(3) is dispositive in this Court's decision regarding class certification. This Court therefore declines to engage in further analysis under Rule 23(a)."); *accord In re Ford Motor Co. Ignition Switch Prod. Liab. Litig.*, 174 F.R.D. 332, 339 (D.N.J. 1997); *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 453 (D.N.J. 1998).

### IV. CONCLUSION

For the foregoing reasons, Amansac's motion for class certification is denied. An appropriate Order accompanies this Opinion.

Dated: October 24, 2022

*[signature: Evelyn Padin]*

Evelyn Padin, U.S.D.J.